117 So.2d 74 (1959)
LeRoy P. PITRE et al., Plaintiffs-Appellees,
v.
Wilson ROBERIE et al., Defendants-Appellants.
No. 4915.
Court of Appeal of Louisiana, First Circuit.
December 21, 1959.
*75 Dubuisson & Dubuisson, Opelousas, for Roberie & Southern Farm Bureau Cas. Ins. Co.
Garland, DeJean & LaHaye, Opelousas, for LeRoy P. Pitre et al.
Davidson, Meaux Onebane & Donohoe, Lafayette, for Diesi Pontiac-Cadillac, Inc. and Hanover Fire Ins. Co.
ELLIS, Judge.
On October 9, 1957, at approximately 8 P.M. an automobile collision occurred on U. S. Highway 67 near and west of the town of Sunset, La., in St. Landry parish. Involved in the collision was a truck loaded with 700 crates of sweet potatoes belonging to the defendant Wilson Roberie, and insured by the codefendant, Southern Farm Bureau Casualty Insurance Company and being driven by Roberie's employee, Raphael Fontenot, toward the town of Sunset, La., in a southerly or easterly direction, which struck the left rear fender and taillight of a Mercury automobile which had been involved in a collision a short time prior thereto, and which at the time was being towed by a 1951 Chevrolet wrecker being operated by Francis F. Cahanin, an employee of the owner of the wrecker, Diesi Pontiac-Cadillac Inc., also made defendant and being insured by the Hanover Fire Insurance Co., also made a defendant. The Roberie truck veered or was driven into the north lane for approaching traffic traveling from Sunset toward Opelousas and collided head on with the automobile being driven by the plaintiff, Pitre, with his wife on the right front seat as guest passenger. As a result of the accident suit was filed by plaintiff Pitre for damages for his personal injuries and loss of his wife who was killed immediately in the collision, and by plaintiff, Dess Devillier, the duly appointed and qualified tutor for the two minor sons of Mrs. Pitre by a former marriage, Donald Leo David and James R. K. David, against the above-named defendants. A separate suit was also filed by the Southern Insurance Company, plaintiff Pitre's insurer, for $1,292.44 covering the property damage or value of the Pitre automobile which was paid to the latter by the former.
*76 Also a plaintiff in this suit with Southern Insurance Company was LeRoy P. Pitre who sued for the $50 deductible under the terms of the policy. This suit was filed against the driver of the wrecker, Francis F. Cahanin, Raphael Fontenot, driver of the Roberie truck, and Wilson Roberie, the owner of the potato truck.
These two suits were consolidated for the purpose of trial, separate judgments rendered in each.
In the suit by Pitre for personal injuries and as a result of the loss of his wife, and Dess Devillier, tutor of the two minor children of Mrs. Pitre, a verdict was rendered by a Civil Jury, upon which judgment was signed in favor of LeRoy P. Pitre and against the defendants, Wilson Roberie and Southern Farm Bureau Casualty Insurance Company, jointly and in solido in the sum of $11,238.98 and in favor of Dess Devillier as tutor of the minor James R. K. David and against Wilson Roberie and Southern Farm Bureau Casualty Insurance Company, jointly and in solido in the sum of $8,000, and in favor of the tutor for Donald Leo David and against the same two defendants, jointly and in solido in the sum of $4,000, together with legal interest from date of judicial demand. It was further ordered, adjudged and decreed that the entire total limit of liability of the Southern Farm Bureau Casualty Insurance Company "be limited herein to the amount of $10,000.00 plus interest and court costs for any one person and that Southern Farm Bureau Casualty Insurance Company be limited to $20,000.00 for the whole of any one occurrence, plus interest and court costs." It was further ordered, adjudged and decreed that the claims of all plaintiffs in this suit "be and they hereby are dismissed insofar as the defendant, Diesi Pontiac-Cadillac Inc. and Hanover Fire Insurance Company are concerned."
Judgment was also signed based upon the verdict of the jury in favor of the plaintiff Southern Insurance Company and LeRoy Pitre against Wilson Roberie and Raphael Fontenot in favor of the insurance company for $1,102.48, the amount paid Pitre for the damage to his automobile and in favor of Pitre for $50 representing the deductible amount due him under the policy. The claim in this suit against Francis Cahanin, driver of the Diesi Pontiac-Cadillac Inc. wrecker was rejected.
After a new trial had been denied in both suits, the parties cast appealed to this court.
The plaintiff, LeRoy P. Pitre, and Dess Devillier, duly appointed and qualified tutor for the two minors, also have appealed devolutively from the verdict and judgment rendered in the case, asking that the jury's verdict be sustained as to the liability against Wilson Roberie and Southern Bureau Casualty Insurance Co., jointly and severally, but asking also that the judgment be set aside and amended in so far as it found no liability against the Diesi Pontiac-Cadillac, Inc., and Hanover Fire Insurance Co., asking that all of the defendants listed in the suit be found liable, jointly and in solido, and that the award for each plaintiff therein be increased to the amounts originally sought in the prayer of the petition.
The proven facts are contained in a voluminous record but are clear and concise. On the night of the collision with which we are concerned in the present case, the Mercury automobile had been in a collision on the same highway between Opelousas and Sunset, and had been attended by the same Troopers who were almost within visible distance of the accident involved in the suit under consideration. The Diesi Pontiac-Cadillac Co. wrecker went to the scene of the first collision, secured the Mercury automobile to the back of the wrecker so that he could not swing or sway and with full lights burning, which were located on the headache rack which is a structure that extends from the bed of the wrecker up and above and over the rear of the cab of the wrecker truck. The lights on this *77 headache rack consisted of taillights, large lights which were controlled by a separate switch which was used in backing, blinker lights for directional signals, and also clearance lights on the side of the wrecker. In fact the lights were referred to by counsel for defendant on the night in question as having the effect of "a Christmas tree". Also, it is definitely shown by the owner of the Mercury, driver of the wrecker, and the two troopers that at the time the wrecker left the scene of the accident with the Mercury automobile, the parking lights had been turned on on the latter and both taillights were burning, and the wrecker and the taillights on the Mercury could be seen plainly and clearly by a following vehicle. The wrecker was towing the Mercury automobile to a small garage with a Ushaped entrance and exit just to the west of the town of Sunset, La. and after the cab of the wrecker had turned from the highway, the potato truck, being driven by Fontenot for the defendant Roberie, was coming from Opelousas toward Sunset at approximately 40 miles an hour and the driver did not see the wrecker or towed automobile until within 100 or 150 feet to its rear. In an effort to avoid hitting the towed automobile, he pulled to his left, however the right front portion of the potato truck struck the left rear fender of the Mercury automobile, and then proceeded into the approaching lane of travel just at the time the plaintiff Pitre and his wife were almost opposite the wrecker, striking the Pitre automobile head on, scattering the potatoes all along the highway, and resulting in the personal injuries to Pitre and the immediate death of his wife. It is shown that there was a traffic light at the western edge of the town of Sunset, and when the Pitre automobile passed on its way toward Opelousas just prior to the accident, approximately 2/10 of a mile, the two troopers who had gone to the wreck in which the Mercury car had been involved but had already returned to Sunset, La., were parked near this light and saw what later was the Pitre car pass by, and immediately following the Pitre car was an automobile with defective taillights. The troopers got in their car and overtook the car with the defective lights and ordered it to pull on to the side of the highway only several hunderd feet from the scene of the Pitre wreck with the potato truck. They had just gotten out and walked up to the window of the car when they heard the impact and could see the dust from the collision. It was shown that the little garage was lighted close to the highway. They immediately got in their car and rushed up to the scene of the collision with which we are now concerned, and found Mrs. Pitre dead and after eliminating all possibility of fire to the Pitre automobile laid her on the side of the highway. These two troopers testified that all the lights were burning on the wrecker, that the front part of it was diagonal to the highway, but that it had not all cleared the pavement and that the left rear light of the Mercury had been knocked out or broken by the impact of the potato truck, but that the right rear light was burning as well as the parking light. In other words, all lights which they saw when the wrecker picked up the Mercury and when they passed it a short distance from the scene of this accident were burning except the left rear taillights which admittedly had been broken in the collision by the potato truck. They testified positively that any one approaching from the rear could see the taillights of the Mercury automobile as well as the light on the headache rack on the wrecker truck. They talked to the driver Fontenot, and he told them that he had not seen this wrecker nor the lights of the car being towed until he was within 100 or 150 feet traveling at a speed of approximately 40 miles an hour, and that in order to avoid striking it he pulled into the lane of the approaching Pitre car,that he just could not stop the truck in time to avoid the collision.
*78 Learned counsel for the defendants cast, viz., Southern Farm Bureau Casualty Insurance Company, and Wilson Roberie, makes the following argument which is hereby quoted in full as to the question of liability and we quote:
"What one should do while operating a motor vehicle is to be guided by what a careful man should do under the same circumstances. The young Negro driver of the Roberie truck (who would have admitted to stabbing his mother if asked) told of coming up on the Diesi wrecker without realizing the trap which was lurking in the dark.
"The evidence is so clear that the Diesi wrecker was well illuminated that no argument on the question is necessary. It was a white truck with two tail lights on the headache rack which is just back of the cab. In addition there was a directional signal light located at the same place.
"The driver of the wrecker turned into the driveway with which he said he was familiar but he was unaware that the driveway was partially blocked by dirt. Accordingly it was necessary for him to bring his wrecker to a stop or near stop. When he did so the lights on his headache rack were on the right shoulderoff of the paved slab. Naturally the Roberie driver thought that his way was clear and could not dream that the bright lights of the wrecker were really a trap; that behind those lights was a disabled black vehicle. In short he was lured into an inextricable position.
"Reflect on this scene, Your Honors, and we feel sure that you will conclude that the reasonably prudent driver could not have known that the `Christmas tree' ahead was really a wrecker on the shoulder of the road with a towed vehicle partially blocking the right lane.
"The sole cause of this accident was the negligence of the Diesi wrecker."
Counsel for the defendants made a much longer argument on liability but in the main he took the same position as reflected in his brief, viz., that the "Christmas tree" effect of the wrecker was on the shoulder of the road just prior to the collision and that the towed vehicle was partially at an angle so that the taillights had been concealed, so to speak, from the driver of the potato truck, and that it was really "a trap". The testimony does not substantiate or bear out counsel's contention, and we are firm in our opinion that the facts do not bring it within the exception to the general rule established by our jurisprudence, a citation of which we deem unnecessary. There was no legal excuse for the driver of the Roberie potato truck not to have seen the towed automobile and the wrecker or to have had his car under such control that he could have stopped before being forced to pull into the lane of approaching traffic which he is bound to have seen or should have seen, in an effort to avoid striking the towed automobile. Had the wrecker and towed automobile been stationary, under the facts and conditions, the driver of the Roberie potato truck should have seen it in time to have avoided the accident completely had he been keeping a proper lookout, however, this wrecker and towed automobile with all the lights burning as heretofore described had been coming straight down the highway and the big directional blinker lights on the top of the headache rack of the cab of the truck in clear view to traffic approaching from the rear had been placed in operation 100 to 125 feet from the U-turn to the right of and off of the highway by the driver of the wrecker. The driver of the Roberie potato truck should have seen these blinkers when they were put on and should have realized when he was at a safe distance that the motor unit in front of him intended to turn to the right, and *79 should have taken all necessary precautions to avoid any collision.
For the reasons given we are firmly of the opinion that the liability rests with the driver of the Roberie potato truck.

Damages
The limits of the policy for bodily injury liability is $10,000 for each person and $20,000 for each accident. Based upon the policy limits counsel for the defendants, Roberie and Southern Farm Bureau Casualty Insurance Company, sets forth in his motion for a new trial, which he made part of his brief to this court, the following argument:
"III. That as a result thereof the jury returned an impossible verdict as against movent in awarding to Dess Devillier, as tutor, the sum of $8000.00 for and on behalf of the minor, James R. K. David, and the sum of $4000.00 for and on behalf of the minor, Donale Leo David, and also in awarding to plaintiff, Leroy Pitre, the sum of $11,238.98, which included not only his claim for damages as a result of his own personal injuries but also his claim for damages for the death of his wife, including her funeral expenses;
"IV. That the policy issued by Southern Farm Bureau Casualty Insurance Company to Wilson Roberie had limits in the case of personal injuries or death of $10,000.00 for any one person involved in an accident and a total of $20,000.00 for any number of persons injured or killed in any one accident;
"V. That therefore the maximum for which Southern Farm Bureau Casualty Insurance Company could be liable for damages as a result of the death of Annie Devillier Pitre, the wife of Leroy P. Pitre and the mother of the minors, James R. D. David and Donald Leo David in the sum of $10,000.00.
"VI. That obviously the verdict of the jury exceeded this policy limit and just as obviously the jury included in the award to Leroy P. Pitre damages for the loss of his wife, the exact amount of which is unknown due to the manner in which the jury rendered a verdict, and such amount would have to be deducted from the award made to Leroy P. Pitre in ascertaining the amount for which Southern Farm Bureau Casualty Insurance Company is liable as a result of the death of Annie Devillier Pitre;
"VII. That it is impossible to ascertain how much was awarded Leroy P. Pitre for damages as a result of the loss of his wife, but obviously it was such that the award made to him for damages for his own personal injuries was less than the sum of $10,000.00 and as a result of the judgment as now drawn movent is being deprived of a credit for the difference between $10,000.00, the maximum that could have been allowed to Leroy P. Pitre against Southern Farm Bureau Casualty Insurance Company as a result of his own personal injuries, and the amount that actually was awarded to Pitre as a result of those personal injuries."
The award of $8,000 to the 14 year old minor son and of $4,000 to the 18 year old minor son who was in the Navy at the time of the death of his mother is in line with the jurisprudence and is not manifestly erroneous and will be affirmed.
We will next discuss the personal claim for injuries by the plaintiff LeRoy Pitre. He was examined at the St. Landry Clinic soon after his arrival on the night of the accident, Oct. 9, 1957, by Dr. Emile K. Ventry, who testified that Pitre was in shock from pain and that "He had some lacerations on the forehead and a very extensive laceration on the left knee with a large bruise and soft tissue injury to the knee and had a localized fracture of the tibia, of the large bone, about two and a *80 half or three inches below the knee." This localized fracture was more particularly described by the doctor as follows: "Well, it was a peculiar type of injury. It was what I call a localized fracture. It didn't break the bone in two. It looked like in the injury something had been driven into his leg. He had an area of bone about, oh, an inch, an inch and a quarter in diameter, a round area, that had been gauged out and was about 3/8 of an inch deep or about ½ an inch deep, with a lot of bone fragments, apparently like he had driven his knee into some object or some object had been driven into his knee and before we could suture the laceration up, we had to take bone fragments and clean this fracture out. The x-rays didn't show any extensions from this localized fracture to the bone or anything. It was just this localized break and injury to the bone." Dr. Ventry described plaintiff's condition as being conscious when he saw him but in pain and complaining also of his neck hurting him. He was given some sedatives for the pain and made as comfortable as possible, the wounds were cleaned and sutured; he was given a tetanus toxoid, and started on some antibiotics. Pitre got up the next afternoon and with the aid of a crutch and his relatives, attended the funeral of his wife. He therefore stayed in the hospital the night of the accident and approximately one half of the next day. Plaintiff returned to his father's home and thereafter was treated by this doctor on Nov. 11th, 12th, 14th, 15th, 16th, 17th, 24th of October, 1st, 7th, 22nd of Nov., 15th of February and then was seen again by this doctor on the 7th of April 1958. During these visits he received dressings, sutures, shots, treatment to his back, diathermy treatments and further injections for his leg and the injury to his knee. On the 15th of February 1958 he was discharged by this doctor as being able to return to his former work, however, up until that time Dr. Ventry testified that he was unfit to do any type of manual labor.
After being discharged by Dr. Ventry the plaintiff, during the first part of March, 1958 applied for work with the Circle Drilling Company, which required a physical examination by Dr. DeRouen, which resulted in the plaintiff being rejected for the reason that he had a left and right inguinal hernia. Plaintiff then came back to see Dr. Ventry on April 7, 1958 and was given an examination by the latter and he also found the double hernia. Plaintiff then applied to the Veterans' Hospital as he did not have the money for a private hospital and operation. There was some delay and plaintiff decided to try to obtain an operation by a private doctor at a private hospital so he cancelled the order at the Veterans' Hospital. After making application with the Veterans' Administration on May 26, 1958, for a hernia operation and being notified to report for the operation on July 17, 1958, plaintiff returned to the St. Landry Parish Veteran Service Officer and cancelled the authorization for the reason that he stated that he could obtain hospitalization locally at the expense of the Insurance Company for the injuries. Plaintiff, however, returned to the service office on Sept. 16, 1958 and he was finally authorized to enter the hospital on Oct. 10, 1958, which he did, and the operation was performed on the 14th of October, 1958. He remained in the hospital for 13 days or until October 27, 1958, when he was discharged. He went back to work on the 23rd day of December, 1958.
Counsel for the defendant contends that to allow damages for the hernia would be to make the burden of proof even lighter than in a workmen's compensation case and he cites Duplechain v. Southern Farm Bureau Casualty Insurance Co., La.App. 1 Cir., 91 So.2d 926. In that case the question was one of proof or the lack thereof as to the occurrence of an accident, whereas in the present case the question would be whether the testimony proved the hernia of the plaintiff *81 resulted from the accident. On this point the plaintiff was examined the day prior to this accident by Dr. I. H. Saltz of Morgan City for employment with the Reagan Tool Company, Inc., and this doctor's report has been introduced in evidence. It shows that he was examined physically for a hernia and none was found. The accident occurred on Wednesday, Oct. 9, 1957 and plaintiff was to go to work as a result of his examination of Oct. 8, 1957, on the following Monday for this tool company. There is no testimony of plaintiff having injured himself in any manner other than as the result of the wreck, and the only medical testimony on a hypothetical question under the facts was that they would believe that the hernia was caused by the accident. It is true that he never complained of any pain in his abdomen or in the region of these hernias, however, Dr. Ventry, as well as the plaintiff, stated that he was in such great pain otherwise that this would be excusable. We believe that he has proven that the hernia was the result of this accident.
In view of the fact that the jury lumped together all items of damages which it found the plaintiff was entitled to, the sum of $11,238.98, it is impossible to tell how much was awarded as the result of the death of his wife, for the loss of love, companionship, etc., and how much was awarded to plaintiff for his personal injuries in the accident. Plaintiff and his wife had been married since approximately more than a year at the date of the accident. She was 37 years old and apparently they were happy, and he had provided a living for her and the minor son. Under the particular facts in this case, we will award $5,000 for the loss of love, affection and companionship of his wife. In addition, plaintiff is entitled to funeral expenses for his wife in the amount of $599.20. This will be a total of $17,599.20 due as the result of the death of the mother and wife.
Plaintiff is entitled to medical expenses in the following sums: Dr. Gillespie, $5; Dr. Ventry, $126; operation at Veterans' Hospital, $294.84; Travel expense and meals in connection with the medical examination and operation, $35; St. Landry Clinic, $54.15 and $15, a total of $69.15; Schutz Drug Store, $6.54, Dr. Schutz, $25, making a total medical of $567.62.
As to damages for plaintiff's personal injuries, the record reveals that he was off from work approximately one year, however, the counsel for defendant contends that he failed to minimize the damages by having the operation after learning of the bilateral hernia on March 25, 1958. This operation was not performed until Oct. 14, 1958. The earliest date shown in the record that he could have been operated on was July 16, 1958, and if we add 60 days to that time it would bring it to around September 14th that he could have returned to work, or approximately two months sooner than he actually returned to work after the Oct. 14th operation. We do not believe, though, that the plaintiff unduly delayed the operation for the purpose of collecting additional damages. The record shows that he wanted the operation but felt that he could not bear the expense of a private hospital, and then after obtaining the affirmative answer to his request at the Veterans' Hospital, he cancelled it believing that he could obtain a private operation. He did not, and then had to return to the Veterans' Administration. We believe he is entitled to loss of earnings for twelve months. With the Reagan Tool Company he was to earn $2.15 for 40 hours and time and a half for an additional 10 hours, which would entitle him to wages in the amount of $6,149.
Plaintiff suffered pain as a result of the fracture, the injury to the knee joint and the hernia operation which we believe entitled him to an award of $2,500.
Plaintiff is therefore entitled to judgment for personal injuries, pain and suffering and loss of wages in the amount of $6,149; medical expenses in the amount *82 of $567.62; loss of love, affection and companionship of his wife, $5,000; burial expenses, $599.20, or a total of $14,815.82.
It is therefore ordered that the verdict of the jury and the judgment of the court be amended by increasing the amount of the judgment in favor of the plaintiff, LeRoy Pitre, to $14,815.82, and that in all other respects it be affirmed.
Amended and affirmed.